[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION STATEMENT OF THE CASE
Plaintiffs, area residents, appeal pursuant to Conn. Gen. Stat. 8-8 (rev'd to 1989, amended by Conn. Pub. Acts No. 89-356, 1, (1989)) from the decision of the defendant Stamford Zoning Board of Appeals [the "Board"] granting a variance and special exception requested by defendant Long Ridge Congregational Church [the "Church" or the "Applicant"].
FACTS
By application number 175-89 and received by the Board on November 1, 1989 the Church applied for a variance and special exception. (Record, Item 2, Application.) The Applicant listed the location of the "affected premises" as 455 Old Long Ridge Road and the owners of the premises as Charles Beckett and Joel Sisman, Trustees. (Record, Item 2.) While the Zoning Plan submitted with the application shows the property depicted therein as a single parcel, the property in the upper left corner of the Plan containing the wood frame meeting house and church building is owned by the Church, and the remaining contiguous property is owned by the Trustees. (Record: Item 2, Attachments to Application: Item 4, p. l, Zoning Plan; Item 8 p. 3, Map attached to Memorandum dated November 6, 1989).
Although the application states otherwise, the record reflects that both parcels are located in an RA-2, One Family Residence District which is a two (2) acre zone. (Record: Item 2; Item 4, p. 1 Item 10, copy of Notice of Public Hearing Item 22, pp. 14-5, Transcript, Public Hearing, January 24, 1990 Item 28, Stamford Zoning Regulations 4A, 4AAl.5, pp. 4-l, 4-4 [hereinafter: the "Regulations"].) There is evidence :that the Trustees' property is only 1.733 acres (Record: Item 22, p. 36; Item 8, p. 3) and that when the lot was created, the district was CT Page 1146 an RA-1, one-acre zone (Record, Item 22, pp. 14-5). Combined, the Church's property and the Trustees' property total 1.9889 acres. (Record: Item 22, p. 14; Item 4, p. 1.)
By its application, the Church sought a special exception pursuant to sections 19.3.2a and c of the Regulations to permit the continued use of the church and to permit a proposed structure on the Trustees' property to be used primarily as a non-public school and and as a church facility. (Record, Items 2, 10.) Non-public schools and churches are permitted in an RA-2 district when approved by the Board under section 19 of the Regulations. (Regulations, Appendix A, Table I, pp. A-l, A-2, A-4.) The Church also sought a variance of the sixty (60) foot front yard setback requirement set forth in the Regulations. (Record, Items 2, 10; Regulations: Section 4AAl.5, p. 4-4; Appendix B, Table 3, p. B-l.) The two (2) existing buildings on the Church's property and the building proposed for the Trustees' property are to be connected by a covered walkway. (Record: Item 4, p. 1; Item 22, p. 16.)
A public hearing was noticed for and held on January 24, 1990. (Record: Item 10; Item 13, Statement of Notification of Property Owners; Item 22.) The hearing was closed at the conclusion of the January 24th meeting. (Record, Item 22, p. 72.) The Board arrived at its decision to grant both the special exception an variance, subject to five "restrictions, n at its meeting on February 21, 1990. (Record: Item 23, Transcript of Board Meeting; Item 24, Board's Decision.) Notice of the Board's decision was published on February 28, 1990. (Record, Item 27, Copy of Notice.) Plaintiffs' appeal was timely commenced by service of the defendants (the Board, the Chairman of the Board, and the Church) and the Stamford Town Clerk on March 12, 1990, within fifteen (15) days of publication of notice of the decision. See Conn. Pub. Acts No. 90-286, 1, 3, 9 (1990).
The appeal was commenced by the following as plaintiffs: Marie Hughes, Robert Hughes, Rhoda Rossmoore, and William Rossmoore. See Complaint.) By motion granted April 16, 1990 by the court, Cioffi, J., plaintiffs received permission or Marie and Robert Hughes to withdraw as parties plaintiff, and John Salisbury, Hildegard Hard, and Arietta Smith received permission to intervene as parties plaintiff.
At the hearing on appeal, October 31, 1990, Nancy Salisbury, wife of plaintiff John Salisbury, testified and presented evidence to the effect that she and her husband are aggrieved. (See Plaintiffs' Exhibit A and B (mistakenly labeled Defendant's Exhibit A and B).) Also plaintiff Hildegard Hard testified to the effect that she is aggrieved. The court, made CT Page 1147 a finding of aggrievement. No other testimony or evidence concerning the aggrievement of the remaining plaintiffs was offered. However, whether or not there are additional aggrieved parties will "have no effect on the outcome of this appeal" because "the issues relevant to all claimed errors on the part of the zoning [Board] are reviewed." Schwartz v. Town Planning Zoning Commission, 168 Conn. 285 n. 2 (1975); Beit Havurah v. Zoning Board of Appeals, 177 Conn. 440, 442 n. 2 (1979).
Plaintiff's brief is dated June 27, 1990. Defendant Church's brief is dated August 3, 1990. The Board adopts the Church's brief.
ISSUE
Whether the Board acted arbitrarily, illegally or in abuse of its discretion in granting the Church's application for a variance and special exception such that the court should sustain this appeal.
A trial court may grant relief on appeal from a decision of an administrative authority only where the authority has acted illegally or arbitrarily or has abused its discretion. Raybestos-Manhattan, Inc. v. Planning Zoning Commission,186 Conn. 466, 470 (1982). The burden of proof to demonstrate that the local authority acted improperly is upon the plaintiff. Adolphson v. Zoning Board of Appeals, 205 Conn. 703, 707 (1988) Burnham v. Planning Zoning Commission, 189 Conn. 261, 266
(1983). Although raised in the complaint, issues which are not briefed are considered abandoned. State v. Ramsundar, 204 Conn. 4,16 (1987) DeMilo v. West Haven, 189 Conn. 671, 681-82 n. 8 (1983).
DISCUSSION
Plaintiffs argue that no hardship has been shown which would justify the granting of the requested variance; that in granting a variance, the Board may not "sweep away the regulations as they pertain to a particular piece of property;" that the proposed construction violates the side yard setback requirement for which no variance was sought or granted; that the parking provided is insufficient to satisfy the proposed new construction; and that the proposed structure will adversely affect the neighborhood.
A. Hardship
"A variance is authority extended to the owner to use his property in a manner precluded by the zoning regulations. Eagan v. Zoning Board of Appeals, 20 Conn. App. 561, 563 (1990) CT Page 1148 (citation omitted). "A zoning board has the power to grant a variance if the variance will not substantially affect the comprehensive zoning plan and if strict adherence to the zoning ordinance would cause unusual hardship unnecessary to achieving the plan's purpose." Id. (citations omitted); see also Conn. Gen. Stat. 8-6 (rev'd to 1989); Regulations, 2.1, 2.2.a. "Proof of hardship is, therefore, a condition precedent to the granting of a variance, and such hardship must arise from the circumstances or conditions beyond the applicant's control." Egan, 20 Conn. App. at 563 (citations omitted).
"[H]ardship is established `where a board could reasonably find that the application of the regulation to the property greatly decreases or practically destroys its value for any of the uses to which it could be reasonably put and where the regulation, as applied, bears so little relationship to the purposes of zoning that, as to particular premises, the regulation has a confiscatory or arbitrary effect.'" Grillo v. Zoning Board of Appeals, 4 Conn. App. 205, 208 (1985) (citations omitted). "It is well settled that the granting of a variance must be reserved for unusual or exceptional circumstances." Aitken v. Zoning Board of Appeals, 18 Conn. App. 195, 205 (1989) (citation omitted). "`Where the claimed hardship arises from the applicant's voluntary act, . . .a zoning board lacks the power to grant a variance. . . . The hardship which justifies a board. . .in granting a variance must be one that originates in the zoning ordinance. . .and arises directly out of the application of the ordinance to circumstances beyond the control of the party involved.'" Id. at 206. (citations omitted by court). "It is well established that a hardship that is self-created is never a proper grounds for a variance." Id. (citation omitted). Connecticut courts have recognized that "[a] hardship resulting from the peculiar topography or condition of the land or from a particular location which makes the land unsuitable for the use permitted in the zone in which it lies may well be such a hardship as is contemplated by the ordinance." Talmadge v. Board of Zoning Appeals, 141 Conn. 639, 643-44 (1954) (citations omitted); Fiorilla v. Zoning Board of Appeals, 144 Conn. 275,280 (1957).
In the instant case, the Church sought a variance of the sixty (60) foot front yard setback requirement applicable to property in an R-2 district as shown in section 4AAAl.5 and Appendix B, Table 3 of the Regulations. See also Regulations, 71 (requiring compliance with Regulations even when parcel fails to meet area requirements). However, the record and the parties' briefs contain conflicting statements as to the location and purpose of the variance requested.
In the Church's application to the Board, the Church stated CT Page 1149 that it was requesting a variance to allow a "0 front yard rather than the [sic] required 60' front yard. . .[because] strict compliance with the regulations would require the proposed structure to be located an additional 60' from the sanctuary located on contiguous property owned by the applicant and would destroy the unity of design inherent in the architect's concept." (Record, Item 2 (emphasis added).) Similarly, in a letter accompanying the Church's application, Paul Shapero, then counsel for the Church, stated:
 In connection with the plans which I am submitting, I would explain to you. . .that the map which shows the parcels as a single unit without any boundary lines between them is based on the fact that the church as an entity owns one parcel and trustees for the church own the contiguous piece of land.
 The church has a contract to purchase the parcel from the trustees, should the application be approved. Accordingly, if the application is approved, the two tracts will be treated as a single piece of land and, therefore, there will be no boundary line existing between the two tracts.
(Record, Item 2, p. 2.) At the time of the application, the Church apparently believed it needed a variance of the front yard setback for the proposed meeting hall to be located on the Trustees' property. (See Record, Item 4, p. 1, Zoning Plan.) However, the transcript indicates that at the time of the public hearing, the Church represented to the Board that the variance was not for the proposed meeting hall to be located on the Trustees' property, but for the existing buildings located on the Church's property. Paul Shapero, counsel for the Church, stated at the public hearing:
 The Church has [sic] under contract to purchase a copy of that is in your file, this property upon which the new building is going to be built. The two properties will then be combined. It's important that you understand that because the fact that they are separate properties now which will be combined upon approval of this application, brought about the need for the variance which we are requiring.
(Record, Item 22, p. 6.) Mr. Shapero continued:
 The variance that we need occurs over here. Because these properties have not yet been combined, Mr. Macri interpreted it to need a variance of the front yard setback in order to maintain these two buildings where CT Page 1150 they are now. That is the meeting house and the church. They are less than 60 feet from the middle line of Old Long Ridge Road. I've gone over this with Mr. DePreta [, Land Use Administrative Officer (Zoning Enforcement)]. I think what I'm telling you is correct. I know that we have to have that variance. If Mr. DiPreta says we don't need it, I'd be glad to withdraw it. But evidentally we do. It's one of those weird interpretations. I believe that when we put those two properties together, which we're going to do once we get permission to go ahead, this one would be omitted and we would be all right. But evidentally that presents a problem, so that's why we're asking for that variance.
(Record, Item 22, p. 11 (emphasis added).)
And later in the hearing, the following discussion took place involving Paul Shapero, Counsel for the Church; Willis Mills, President of SMS Architects in New Canaan, appearing on I behalf of the Church; John Sedlak, member of the Board; Sally Levene, alternate member of the Board; and Leonard DiPreta, Land Use Administrative Officer (Zoning Enforcement):
 Mrs. Levene: It is your impression that to start building that covered walk-way, you need nothing for the present property that the church is on. That particular — in other words, on that —
 Mr. Shapero: We're not going to start building until all this has been taken away. What we need the variance for is to permit the use of these two buildings and this. Is that correct?
Mr. Mills: Correct.
 Mr. Sedlak: Well the front yard variance that you're requesting is for the new building. Is that correct?
Mr. Shapero: No.
Mr. Sedlak: It is not.
 Mr. Shapero: It's for the two old buildings. These buildings.
 Mrs. Levene: So you're really considering two properties with this variance request?
Mr. Shapero: We have two properties. We own this CT Page 1151 and we have this under contract, okay? And I was told by the Building Department that because this property presently did not have adequate front yard, we'd have to get a variance if we're going to do anything to it by adding this covered walk-way. Is that correct, Mr. DiPreta?
 Mr. DiPreta: I think what the condition is, is if you're going in for a consolidation of the two properties, in order for you to do that and to be accomplished, you would need a variance to allow the two remaining structures to remain on the property.
Mr. Shapero: But it's a front yard variance.
 Mr. DiPreta: You would need to get a front yard variance.
Mr. Shapero: And that's what we ask.
 Mr. Sedlak: So for the front yard, you're asking for a zero front yard setback. Is that in fact — do you have a zero front yard setback.
 Mr. Mills: Well the front yard setback would probably range 12 to 13 feet. That's the closest part of the church to the property line.
Mr. Shapero: See, and there are also steps here.
 Mr. Sedlak: So the zero is just to make sure you have enough of a setback.
Mr. Shapero: That's exactly right.
 Mr. Sedlak: But it's not — you have really more than zero.
 Mr. Shapero: If you want to say you will vary it to 10 feet, I guess we can live with that cause we don't have anything within 10 feet.
(Record, Item 22, pp. 20-2.)
Also, in response to the questions of Lynn Waterbury, an area resident, Mr. DiPreta made the following statements:
 Ms. Waterbury: . . .On the zero setback, if this zoning is a grandfather clause on the zero setback on the side, isn't part of the law that a grandfather clause is in CT Page 1152 effect as long as no changes are made in the future. So I don't understand how a zero setback can be granted in the future.
 Mr. Sanborne: Well did you understand that, Mr. DiPreta. I don't understand what she's saying.
 Mr. DiPreta: I think what they're addressing here is the fact that because they're consolidating the properties, what is needed is the fact that the existing buildings can remain that they just ask for the zero setback. In other words, they're not asking for any movement of the buildings. Really what they're asking for is for the buildings to remain in their present location.
 Ms. Waterbury: But they are adding to a grandfathered area —
Mr. DiPreta: They're asking for a zoning plan.
 Ms. Waterbury: — on zoning. And it was my understanding that by law, once you add anything to a grandfathered zone, you have changed that zone and that is not permissible under the real estate law of Connecticut.
 Mr. DiPreta: Well I think effectively, what you're saying is, the buildings are grandfathered —
Ms. Waterbury: Um-humm.
 Mr. DiPreta: — and by adding the land to it, something must be done to accommodate the fact that those buildings are to remain there. And I think that's what's being addressed. They're asking for a setback variance to allow the existing buildings to remain on the property.
Ms. Waterbury: I thought by law that was not allowable.
 Mr. DiPreta: By law if they're asking for a variance, the Zoning Board of Appeals can grant the variance. In the instant case, the subject property faces six different directions and is bordered by church property, both to the west and the north. The subject property also borders Old Long Ridge Road to the west. Thus, the southerly half of the new building which is located approximately 100 feet from Old Long Ridge Road has no difficulty in complying with the 60 feet front yard setback requirement (RR 4, Tr. 26); but CT Page 1153 the northerly half of the proposed building cannot comply because a strict application of the front yard setback regulation requires measuring the open space from the lot line of the currently owned church property to the new building. To strictly comply in this instance would necessitate relocating the new building so far to the rear or to the south of the property as to be either impossible, impractical or to require additional variances or permits.
 In conclusion, the front yard variance is justified in this case because of many unusual and exceptional features, including irregular shape of the lot, topography, drainage, conservation easement and designated wetlands. Moreover, since both lots will be merged when the subject lot is conveyed to the church, the variance requested and obtained is only a temporary variance (RR 2, Statement of Purpose, Tr. 11). After the conveyance, the common boundary line separating the Trustees' property from the church property will be merged and the new building will be totally conforming and the need for any such variance will evaporate. For all of these reasons, the Board quite properly concluded that strict adherence to the front yard setback requirement would deny the Church the reasonable use of the property. (RR 24).
(Defendant's Brief pp. 6-9.) Therefore, both parties' arguments as briefed are based on the assumption that the variance requested and granted relates to the front yard setback requirement applicable to the Trustees' property and is necessitated by the proposed location of the building to be put I on that property.
 They're allowed to apply for a variance to relieve their hardship, and that's what they're doing in this particular case.
(Record, Item 22, pp. 44-5.) From the above statements made at the public hearing, the variance appears to relate to the setback of the already existing buildings on the Church's property.
The record does not show what variance was granted. At the Board's February 21, 1990 meeting, at which it arrived at a decision on the Church's application, the issue of the variance and the hardship requirement were not discussed. (Record, Item 23.) In the decision itself, the Board merely stated the following with respect to the variance:
To deny this variance would deny the applicant CT Page 1154 reasonable use of the property.
 Therefore, the Board grants a variance of Appendix B (Front Yard Setback Requirement) to have a zero front yard setback in order to construct proposed structure and covered walkway.
(Record, Item 24.)
The parties' briefs add further confusion. Indeed, in the first sentence of plaintiffs' brief they state: "On February 21, 1990, the. . .Board. . .granted the application of the. . .Church for variance of the front yard setback requirement at 455 Old Long Ridge Road. . .to permit the construction of a covered walkway and a proposed new building with zero front setback rather than the required 60 feet front setback." (Plaintiffs' Brief, p. 1 (emphasis added).) In its brief, the Church states:
However, regardless of whether the variance was intended to relate to the Church's property or the Trustees' property, it is found that the record does not support a finding of unusual hardship in either case. First, assuming that the variance was sought for the existing buildings on the Church's property, it is found that there is no evidence that without the variance, the value of the Church's property will be greatly decreased or practically destroyed. See Grillo, 4 Conn. App. at 208. It appears that the Building Department informed the Church that the covered walkway would constitute an addition or expansion of the two existing structures on the Church's property, which were nonconforming as to the setback requirements, and, therefore, that a variance of the front yard setback requirement would be necessary. (Record, Item 22, pp. 20-2.) However, it is found that without the covered walkway or any other addition, the Church could continue to use the property as it is. "Disappointment in the use of property does not constitute exceptional difficulty or unusual hardship. " Krejpcio v. Zoning Board of Appeals, 152 Conn. 657, 662 (1965).
Similarly, assuming that the variance was requested and approved to allow the proposed meeting house to be located within sixty (60) feet of the front lot line of the Trustees' property, it is found that the record contains no evidence of hardship which would support such a variance. The Church argues in its brief that factors such as the location of wetlands, a conservation easement, detention basin, and leaching area and the topography of the land demonstrate the required hardship. It also argues that to strictly comply with the Regulations with regard to the front yard setback requirement would be impossible, impracticable or necessitate additional variances or permits, citing Wadell v. Board of Zoning Appeals, 136 Conn. 1 (1949). CT Page 1155
However, there is no evidence to this effect in the record. (See Record, Item 22.) There is some testimony that simply describes the slope of the land and the location of wetlands and there is evidence that the plan at issue would not require an inlands wetland permit. (Record: Item 4, p. 1; Item 22, pp. 15-6, 23-4 Item 7, Letter from Environmental Protection Board to Applicant, November 9, 1989), but there is no evidence that these factors greatly decrease or practically destroy the value of the land for any uses to which it could be reasonably put. I Grillo, 4 Conn. App. at 208. In the application itself, the church merely stated that strict compliance with the Regulations would cause hardship because the Regulations "would require the proposed structure to be located an additional 60 feet from the sanctuary located on contiguous property owned by the applicant and would destroy the unity of design inherent in the architect's concept." (Record, Item 2.) And at the public hearing, those speaking on behalf of the Church spoke at great length about how much the Church needs the proposed building for its activities (Record, Item 22, pp. 5-14, 65-6, 68-70.) There was testimony that the plan was developed based on the needs of the congregation. (Record, Item 22, p. 18.) There was no testimony specifically addressing how the plan, as it exists, was developed due to or required because of the factors now claimed as the basis of a hardship. (See Record, Item 22.) Nor did the Board discuss the hardship issue during its February 21, 1990 meeting at which it arrived at its decision. (See Record, Item 23.)
A "variance is not a personal exemption from the enforcement of zoning regulations. It is a legal status granted to a certain parcel of realty without regard to ownership. " Garibaldi v. Zoning Board of Appeals, 163 Conn. 235, 239 (1972). "It is for this reason that the rule is well established that the financial loss or the potential of financial advantage to the applicant is not the proper basis for a variance." Id. (citation omitted). The applicant's inability to use the property at its maximum potential will not justify a variance. See Shell Oil Co. v. Zoning Board of Appeals, 156 Conn. 65, 70 (1968). As already stated "[d]isappointment in the use of property does not constitute exceptional difficulty or unusual hardship. " Krejpcio, 152 Conn. at 662. "Hardships in such instances as these do not arise from the application of zoning regulations, per se, but from zoning requirements coupled with an individual's personal needs, preferences and circumstances. Personal hardships, regardless of how compelling or how far beyond the control of the individual applicant, do not provide sufficient grounds for the granting of a variance." Garibaldi,163 Conn. at 239-40.
Therefore, a finding of hardship is not supported by the CT Page 1156 record and the Board acted improperly in granting the variance.
B. "Sweeping Away" The Zoning Regulations
In the second section of their brief, plaintiffs assert that the decision appealed from is illegal and constitutes an abuse of discretion, arguing that under Hulbert v. Zoning Board of Appeals, 158 Conn. 187 (1969), a zoning board of appeals may not "sweep away the regulations as they pertain to a particular parcel of property." (Plaintiffs' Brief, p. 5.) However, Hulbert was an appeal from the grant of an application for variances of the zoning regulations wherein the applicant requested and received waivers of a variety of restrictions and requirements.
 The so-called waiver of chapter 3 3(B) removes the requirement that land, buildings and other structures located in residential zones may be used only for certain enumerated purposes and allows the premises in question to be used for any purpose whatsoever. The waiver of 3(C) of chapter 3 removes all requirements as to lot area and shape, building height, ground coverage, floor area and set-backs for side yard, front yard and rear yard, which means in effect that, in that portion of the lot located in the residential zone, the applicant can erect a structure of unlimited height covering the entire lot area without restriction as to its use. Waiver of chapter 2 2(C)(1) removes any limitation on the expansion, extension or alteration of the present preexisting, nonconforming building located on that portion of the lot located in the residential zone. The waiver of chapter 5(B) (6), applicable to that portion of the lot located in the business zone, means in effect, that the portion of the building located in the business zone can be expanded to cover 100 percent of the lot area.
Hulbert, 158 Conn. at 191-92. The court acknowledged that the town's regulations gave the board, the power to vary the application of the regulations. However, the court went on to state:
 In purporting to act under the regulations, the board cannot completely or substantially sweep away by unlimited and unrestrained waivers zoning regulations as they pertain to a particular parcel of property in the manner in which it was done under the circumstances of the present case. (Citation omitted.) In view of the unrestricted action taken by the board, it is unnecessary to consider the particular issue CT Page 1157 customarily presented wherein a board acts on an application involving exceptional difficulty or unusual hardship. (Citation omitted).
Id. at 193. Thus, the court in Hulbert did not reach the issue of whether the requisite hardship existed but held that because the waivers granted were unlimited and unrestricted such that the applicant's activities would be completely or substantially unregulated, the board acted illegally. Id.
The instant case is not analogous to Hulbert because the Board did not purport to remove all of the restrictions applicable to the subject property but simply sought to vary the front yard setback requirement. Rather than waiving whole sections of the zoning ordinance, the Board here attempted to specify the manner in which the Church could ignore a Particular Provision. See Tondro, Connecticut Land Use Regulation, p. 48 (1979) and Supp. 1983) (citing Hulbert). Therefore, the Board did not act in such a manner so as to "sweep away" the regulations.
C. Side Yard Setback
Plaintiffs next argue that the proposed construction violates the side yard setback requirement for which no variance was sought or granted. The side yard setback requirement in an RA-2 district is thirty-five (35) feet. (Regulations: 4AAl.5, p. 4-4; Appendix B, Table III, p. B-l.) Plaintiffs claim that the proposed covered walkway will extend into the side yard.
The record reflects the following: At the public hearing, Mr. Mills, who spoke on behalf of the Church stated:
 Mr. Mills: Thank you. My name is Willis Mills. I'm the president of SMS Architects in New Canaan and I'm here this evening representing the Long Ridge Congregational Church. The drawing on my right indicates the site and it contains 1.9889 acres and it is in an RA-2 residential zone. And as Mr. Shapero mentioned, you may recall that a hearing before your Board was held on July 26th, 1989. Following that hearing, a determination was made by the corporation counsel that the proposed new building should comply with the 35 foot side yard setbacks of the RA-2 zone, rather than the 20 foot side yard setback of the previous RA-l zone, which was in effect when the lot was created. And on the drawing, you will see two dashed lines. The black dashed line indicates the front and side yard setbacks of the one acre zone. The red dashed line indictes [sic] the front and side yard setbacks of the two acre zone. In CT Page 1158 any case, the application — the previous application was withdrawn. A new revised site plan has been developed and submitted. The basic building plan, the use of the building and the parking layout is similar to what was seen before in July of 1989. The zoning side yard setbacks of the RA-2 zone limit the building construction at the north and south borders and at the west. That is toward Old Long Ridge Road. The front yard setback limits development to within 60 feet of the property line and 35 feet on the sides both to the north and to the south. The dashed red line shows the building setback lines. The dashed green line shows the limit for construction to the east. That is towards the wetland. As you will see, the proposed building does not intrude on the setbacks. A covered walk connecting a new meeting hall to the church and the existing meeting house does intrude on the setbacks and a variance is sought to permit this connecting covered walk. And the variance is also required, as Mr. Shapero has mentioned, to permit the existing meeting house and the existing church to remain on the site which is certainly, I think, everybody's aim.
(Record, Item 22, pp. 14-6) (emphasis added). The marked drawing referred to my Mr. Mills does not appear in the record.
In response to Mr. Mills' comment, Board members John Sedlak and Sally Levene raised questions as to whether the proposed covered walkway was proper:
 Mr. Sedlak: I think the Chairman wanted to bring this up now in case there's any problem develop on what the application should comprehend. The covered walk-way, is there any problem with that in the side yard requirements, because the covered walk-way seems to extend into this 40 foot side yard area. Is that a problem.
Mr. Mills: Yes
 Mr. Sedlak: Is there an application for a variance to that effect or —
Mr. Sedlak: Is there an application for a variance to that effect or —
 Mr. Mills: We assumed that the variance covered that because it is in the front yard as well as the side yard.
Mr. Shapero: It depends which — you see there are two CT Page 1159 tracts. That's what always causes confusion. If you look over here, here's the covered walk-way. And it begins here so that this — it depends which piece you're looking at.
 Mr. Mills: This part of the walk is in the front yard. This part of the walk is in the side yard. That where I've shaded in red is the portion of the covered walk-way that requires a variance.
 Mr. Shapero: It's a single structure. That's really important.
 Mr. Levene: Part of it will be on the church property now. The site of the church?
Mr. Mills: If you don't want to grant —
 Mr. Shapero: Actually, all these interior lines that presently exist, are going to be removed when we combine both these pieces.
 Mr. Levene: But just as a procedural point thought, if you were going to build this walk-way on part of the other, it really should have been two applications together to build this walk-way.
 Mr. Shapero: I can only respond Mrs. Levene, by saying that this was such an arcane question, that I did exactly what I was told to do by the Building Department. I'm not offering that as an excuse. I'm just offering that as a matter of fact. And I know that Mr. DiPreta has reviewed this because I was so confused by it, that — and we both chatted about it. And I think in all due respect, he was confused for a while too. We finally got it straightened out and that's why the application went in with the language that it has at this time. And I believe it has the same language that the last application had and nobody questioned it. In fact, I know they didn't.
 Mrs. Levene: It is your impression that to start building that covered walk-way, you need nothing for the present property that the church is on. That particular — in other words, one that —
 Mr. Shapero: We're not going to start building until all this has been taken away. What we need the variance for is to permit the use of these two buildings and this. Is that correct?
CT Page 1160
Mr. Mills: Correct.
 Mr. Sadlak: Well the front yard variance that you're requesting is for the new building. Is that correct?
Mr. Shapero: No.
Mr. Sadlak: It is not.
 Mr. Shapero: It's for the two old buildings. These buildings.
 Mrs. Levene: So you're really considering two properties with this variance request?
 Mr. Shapero: We have two properties. We own this and we have this under contract, okay? And I was told by the Building Department that because this property presently did not have adequate front yard, we'd have to get a variance if we're going to do anything to it by adding this covered walk-way. Is that correct, Mr. DiPreta?
 Mr. DiPreta: I think what the condition is, is if you're going in for a consolidation of the two properties, in order for you to do that and to be accomplished, you would need a variance to allow the two remaining structures to remain on the property.
Mr. Shapero: But it's a front yard variance.
Mr. DiPreta: You should need to get a front yard variance.
Mr. Shapero: And that's what we ask.
 Mr. Sedlak: So for the front yard, you're asking for a zero front yard setback. Is that in fact — do you have a zero front yard setback.
 Mr. Mills: Well the front yard setback would probably range 12 or 13 feet. That's the closest part of the church to the property line.
Mr. Shapero: See, and there are also steps here.
 Mr. Sedlak: So the zero is just to make sure you have enough of a setback.
Mr. Shapero: That's exactly right. CT Page 1161
 Mr. Sedlak: But it's not — you have really more than zero.
 Mr. Shapero: If you want to say you will vary it to 10 feet, I guess we can live with that cause we don't have anything within 10 feet.
 Mr. Sedlak: But I still question the side yard on the —
Mr. Mills: The covered walk.
 Mr. Sedlak: — covered walk. The fact that there is a shed there now which has virtually zero side yard may have something to do with the zoning interpretation on this. But that I don't know.
 Mr. Shapero: Again, this is sort of a left handed explanation, but when we reviewed this back in May of `88 with the Building Department, beginning with Mr. Macri and subsequently we come to Mr. DiPreta, this is what we were told we needed. We were aware there was a problem. They knew what we were going to construct and they told us that's what we needed.
Mr. Sedlak: Okay. Thank you.
(Record, Item 22, pp. 18-22.)
The record reflects that the covered walkway extends into the side yard setback. The Church, the Building Department, and the members of the Board were confused as to whether a variance of the side yard setback requirement was necessary and that the Board did not demand or receive an explanation as to why a variance of the side yard setback was not requested in the Church's application, except that the Building Department and Mr. DiPreta did not advise the Church to do so. No Regulations or legal authority was cited during the public hearing which would support Mr. DiPreta's advice to the Church. (See Record, Item 22, pp. 18-22.)
The defendants now argue, however, that no variance of the side yard setback requirement is necessary because the covered walkway is an accessory use and, therefore, may intrude upon the side yard setback. In support of this argument, defendants cite sections 3.A.2 and 6.A of the Regulations. Section 3.A.2 defines the terms "Accessory Building or Use" as follows:
 An accessory building or use is one which is subordinate and customarily incidental to the main building CT Page 1162 and use on the same lot providing that such accessory building shall not exceed fifteen (15) feet in height. No accessory building shall be within five (5) feet of any lot line, except in cases in which the main building is permitted to be closer. No accessory building shall be erected prior to the erection of the main building.
Section 6 of the Regulations is entitled "Accessory Buildings" and Section 6.A provides:
 A — No accessory building or accessory structure in a Residential District shall be located in any front yard. No accessory building or accessory structure shall be located in any side yard nearer to the side lot line than the minimum width required for a side yard for the principal building, or in any rear yard unless at least five feet (5') from any lot line.
Defendants argue that, taken together these two sections permit an accessory structure to be located the same distance from the lot line as a legally nonconforming principal building. More specifically, defendants assert that the one-story wood frame meeting house, one of the buildings to be connected by the walkway, is a principal building and is legally located within five (5) feet of the northern lot line and that since no portion of the walkway is closer to the lot line than the old meeting house, no variance is needed. (See Record, Item 4, p. 1.) However, even assuming that the proposed walkway would constitute an accessory building, it is found that, this interpretation of the Regulations lacks merit.
"The principles governing interpretation of zoning regulations are well settled. Promulgation of zoning regulations is a legislative process, although local in scope." Planning and Zoning Commission v. Gilbert, 208 Conn. 696, 705 (1988) (citation omitted). "We interpret an enactment to find the expressed intent of the legislative body from the language it used to manifest that intent." Id. (citation omitted). "`Where a statute or regulation does not define a term, it is appropriate to focus upon its common understanding as expressed in the laws and upon its dictionary meaning.'" Builders Service Corporation v. Planning Zoning Commission, 208 Conn. 267, 276 (1988) (citation omitted). "Zoning regulations. . .cannot be construed to include or exclude by implication what is not clearly within their express terms." Gilbert, 208 Conn. at 705 (citations omitted). "Whenever possible, the language of zoning regulations will be construed so that no clause is deemed superfluous, void or insignificant." Id. (citations omitted). "The regulations must be interpreted so as to reconcile their provisions and make them operative so far as possible." Id. at 706 (citations CT Page 1163 omitted). "When more than one construction is possible, we adopt the one that renders the enactment effective and workable and reject any that might lead to unreasonable to bizarre results." Id. (citations omitted).
The word "permitted" has established meaning in the law of zoning and refers to those uses and structures expressly permitted in the zoning ordinance. See Melody v. Zoning Board of Appeals, 158 Conn. 516, 519 (1969); Tondro, p. 79. All uses and structures are either permitted or nonconforming. Tondro, p. 70; Mrlofy, 158 Conn. at 519. "A permitted use is not a nonconforming use." Melody, 158 Conn. at 519. Therefore, as argued by plaintiffs at the hearing on appeal, it is found that the language of section 3.A.2 prohibiting the location of an accessory building within a certain distance of a lot line, except when "the main building is permitted to be closer" does not include main buildings which are closer to the lot line because they are nonconforming.
Similarly, the language of section 6.A prohibiting the location of accessory buildings nearer to a side lot line "than I the minimum required for a side yard for the principal building" does not allow an accessory structure to be built as close to the side lot line as a nonconforming principal building. The American Heritage Dictionary, Second College Edition, 1985, defines "require" as follows:
 1. To have as a requisite; need. 2. To call for as fitting; demand 3. To impose an obligation on; compel. 4. To command; order.
There is no sense in speaking of "minimum required" distance with respect to nonconforming buildings because they are, by definition, buildings that existed prior to the enactment of such requirements. See Adolphson v. Zoning Board of Appeals,205 Conn. 703, 710 (1988) (citing Tondro, p,. 70). Compliance with the Regulations is not required, demanded, or compelled where a nonconformity is recognized. See Id. Therefore, it is found that the reference in section 6.A to the "minimum required distance "for the principal building" means the distance required by the Regulations, not that existing by virtue of a nonconformity.
The defendants alternatively argue that because the walkway is to be build where a shed, which is nonconforming in that it legally encroaches on the side yard, is presently located, no variance is needed because the encroachment of the walkway on the side yard will be less than that of the shed. In other words, defendants claim that the proposed walkway will reduce an existing nonconformity. They argue that section 10.A of the CT Page 1164 Regulations allows "non-conforming buildings. . .to be continued" and that [i]t is only the extension or expansion of non-conforming uses that are expressly prohibited. . . ." (Church's Brief, p. 12.) Plaintiffs argued at the hearing on appeal that once the shed is torn down, the right to continue a nonconformity is lost and the walkway would then constitute the creation of a nonconformity.
Section 10.A provides as follows:
 A — Any building or use of land or building legally existing at the time of enactment of this Regulation, or of any amendments thereto, or authorized lawful permit issued prior to the adoption of these Regulations which does not conform to the provisions of these regulations for the Use Districts in which it is located, shall be designated a non-conforming use. Such use may be continued but may not be extended or expanded, or changed to a less restrictive use as listed in the LAND USE SCHEDULE in APPENDIX A.
Section 10.A appears to designate a nonconforming building as well as a nonconforming use of land or building as a "non-conforming use." "Such use may be continued. . .," but it is unclear whether the last sentence in section 10.A means that such use may not be changed to a less restrictive use or may be changed to a less restrictive use. Regardless of this ambiguity however, the reference to the Land Use Schedule in Appendix A but not the Schedule of Requirements for Area, Height and Bulk of Buildings in Appendix B suggests that even if section 10.A were read to allow a non-conforming use" to be changed to a less restrictive use, such would only be allowed where the "non-conforming use" was a nonconformity relating to the use of land or buildings, not a nonconformity of a building due to insufficient area. (See also Regulations, 10.E (allows continuation, not expansion or reduction, of buildings nonconforming with respect to area requirements) and 10.C (allows reconstruction of nonconforming building only if destroyed by flood, fire, etc. and if started within twelve months of such calamity))
Furthermore, this interpretation of section 10.A is consistent with section 7.A of the Regulations which provides:
 A — No building shall hereafter be erected, nor shall any existing building be structurally altered, enlarged, rebuilt, or moved, nor shall any land contiguous to any building be encroached upon or reduced in any manner except in conformity to the yard, lot area, building location, percentage of lot coverage, and other space CT Page 1165 and area regulations designated in the SCHEDULE OF REQUIREMENTS FOR AREA, HEIGHT AND BULK OF BUILDINGS under APPENDIX B on pages 158 to 159, and notes appended thereto for the district in which such building or space is located.
Section 7.A prohibits the Church from attempting to erect a new building, i.e., the walkway, unless it is in conformity with the Regulations pertaining to area requirements. Section 7.A would prohibit the movement of the existing shed, even in a manner that would reduce its encroachment on the side yard, unless it was made conforming. (See also Regulations, 10.C, 10.E.) This being the case, defendants do not have the right to erect a nonconforming building in place of the nonconforming shed. Otherwise, the Church and all subsequent owners would forever have the right to erect new nonconforming buildings where the shed is presently located, and, thus, would have the right to create nonconformities.
While the record shows that the proposed walkway will encroach on the side yard, there is no evidence which would support or justify the Board's failure to require a variance of the side yard setback requirement. Nor, have defendants offered a satisfactory argument for why such a variance is not required under the Regulations.
D. Parking
Plaintiffs also argue that the parking area proposed is insufficient. Their argument consists solely of the following:
 The application for the new building proposes that 52-55 parking spaces will meet the requirements of the applicable regulations. However, this is a question of some interpretation in that is [sic] has been projected in a recent study that a minimum of 38 parking spaces are required for the present use and an estimated minimum of 55 additional spaces are required for the proposed meeting hall. Thus, it appears that a minimum of 93 parking spaces will be necessary, and the proposal only provides for about 55, leaving a shortage of at least 38 spaces.
(Plaintiff's Brief, p. 10.)
The "recent study" referred to by plaintiffs does not appear to be part of the record. Thus, plaintiffs have offered no support for their claim and have failed to sustain their burden of proof. CT Page 1166
Furthermore, as defendants point out, section 12.D.2 of the
Regulations provides as follows:
 Parking space for one (1) vehicle for each four (4) seats shall be provided for each Church, Club or Recreational Building at a point not greater than five hundred feet (500') distant in a direct line from the nearest part of such building. (Emphasis in original.)
The record reflects that the proposed meeting hall has a seating capacity of two hundred (200). (Record, Item 22, p. 23.) At one car for each four (4) seats, the parking spaces required total fifty (50). (Record, Item 22, p. 23.) Spaces are also provided for the minister and his secretary, for a total of fifty-two (52). (Record, Item 22, p. 23.) The two proposed parking areas contain fifty-two (52) spaces, "[o]ne near the street with 25 spaces and one to the rear with 27 spaces." (Record, Item 22, p. 23; Item 4, p. 1.)
Plaintiffs offer no explanation as to why parking spaces must be provided based on the combined seating capacity of all three buildings shown on the Zoning Plan when two of those buildings are located on a different lot and have been legally used with no more than street parking Also, there wee testimony as to how the existing and proposed buildings will be used after the construction is completed (Record, Item 22, pp. 5-10, 12-4, 17-8) from which, it is submitted, a conclusion that all three (3) buildings would not be in use at the same time and, therefore, a conclusion that calculations based on the seating capacity of all three (3) buildings are not required, would be reasonable. On the facts of this case, the acceptance by the Board of the calculation of the number of required parking spaces based on the seating capacity of the proposed meeting hall cannot be said to have been arbitrary, illegal or an abuse of discretion.
E. Effect on Neighborhood
Plaintiffs also argue that the proposal will have a negative effect on the neighborhood. Their argument, in toto, is as follows:
 Moreover, the additional structure will greatly increase the noise, traffic and intrusion from lights and congestion, all of which will adversely affect the historic and residential character of the neighborhood and will result in a depreciation of property values and a deterioration of the quality of life for the CT Page 1167 appellants herein.
(Plaintiffs' Brief, p. 10.)
Because plaintiffs simply assert that the proposal will have a negative effect on the neighborhood and do not show that the Board's decision on this point is unsupported by the record, they have failed to meet their burden of proof. Furthermore, the record contains evidence that unsafe traffic conditions and congestion due to the fact that members of the Church now must park on Long Ridge Road will be eliminated. (Record, Item 22, pp. 12-13.) Also, the evidence shows that the proposed addition as seen from the street will not be out of character with the neighborhood. (Record, Item 22, pp. 26-31; Item 4, pp. 5-6.) Also, concerns of neighboring property owners about such factors as head lights, screening, plantings, lighting and design were fully heard at the public hearing and then addressed by the Board at its February 21, 1990 meeting. (Record, Item 22, pp. 31-63; Item 23.) The result, in fact, was that the Board placed five (5) conditions to minimize any effects on the neighborhood upon its approval of the Church's application. (Record, Item 24.)
Therefore, the record supports the conclusion that the proposed plans will not adversely affect the neighborhood.
The plaintiffs' appeal is sustained.